UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES HADDAD,

                       Plaintiff,

vs.                                                             Civil Action
                                                                No. 04-CV74932

INDIANA PACERS, an assumed name, a/k/a
PACERS BASKETBALL CORPORATION, an                               Hon. Anna Diggs Taylor
Indiana corporation, JERMAINE O'NEAL and                        Mag. Judge Donald A. Scheer
ANTHONY JOHNSON, Jointly and Severally,

       Defendants.
_____/

| | |
|---|---|
| **L.S. CHARFOOS (P11799)**<br>**JASON J. THOMPSON (P47184)**<br>Charfoos & Christensen, P.C<br>Attorneys for Plaintiff<br>5510 Woodward Avenue<br>Detroit, MI  48202<br>(313) 875-8080 | **THOMAS W. CRANMER (P25252)**<br>**MATTHEW F. LEITMAN (P48999)**<br>**HIDEAKI SANO (P61877)**<br>Miller, Canfield, Paddock & Stone, P.L.C.<br>Attorneys for Defendant Anthony Johnson<br>150 West Jefferson, Suite 2500<br>Detroit, MI  48226<br>(313) 496-7651 |
| **LAWRENCE G. CAMPBELL (P11553)**<br>**BRIAN M. AKKASHIAN (P55544)**<br>**RICHARD M. APKARIAN, JR. (P66206)**<br>Dickinson Wright PLLC<br>Attorneys for Defendant Jermaine O'Neal<br>500 Woodward Avenue, Suite 4000<br>Detroit, MI  48226-3425<br>(313) 223-3500 | **WILLIAM D. TEMKO**<br>**JOSEPH YBARRA**<br>Admission Pending<br>Munger, Tolles & Olson LLP<br>Co-Counsel for Defendant Jermaine O'Neal<br>355 South Grand Avenue, 35th Floor<br>Los Angeles, CA   90071<br>(213) 683-9266 |
| **STEVEN M. POTTER (P33344)**<br>Potter, DeAgostino, Campbell & O'Dea<br>Attorneys for the Indiana Pacers<br>2701 Cambridge Court, Suite 223<br>Auburn Hills, MI   48326<br>(248) 377-1700 | |

_____/

## MOTION IN LIMINE RE: TESTIMONY OF TIMOTHY R. SMITH
## AN EMPLOYEE OF PALACE OF AUBURN HILLS

     NOW COMES the Plaintiff CHARLIE HADDAD, by and through his attorneys,

CHARFOOS & CHRISTENSEN, P.C., and moves this Honorable Court for an Order

instructing the Defendants not to refer to, or present to the jury any testimony of Timothy R. Smith and/or his written document **(Exhibit A)**, for the reasons that the testimony would either be totally irrelevant and/or that the prohibitive value of the testimony is substantially outweighed by the danger of unfair prejudice and/or confusion of the issues resulting in misleading the jury.

## STATEMENT OF FACTS

On November 19, 2004 Defendants JERMAINE O'NEAL and ANTHONY JOHNSON were employed by Defendant PACERS BASKETBALL CORPORATION as basketball players for the assumed name team INDIANA PACERS. The date is infamous in the history of professional basketball and is often described in the media as the "Palace Brawl."

Inasmuch as there were a multitude of video cameras covering the game, the events leading to the cause of action described herein are pretty much beyond dispute as they are well documented.

**Exhibit A** referred to above, is a document generated by Timothy R. Smith, an employee of the Palace. Although it is not dated, his last sentence on Page 2 reads as follows: "In closing, I saw Mr. Haddad on the floor taking a punch from Mr. O'Neal via TV…" Obviously, this document was written on or after November 19, 2004, that being the date of the brawl at the Palace. By his own statement it is clear that Mr. Smith <u>was not</u> an eyewitness to what happened, and he like millions of others, saw the events in dispute on TV. However, for reasons best known to Mr. Smith and the Palace, **Exhibit A** was generated as an after thought about alleged events occurring weeks earlier, that is

on November 2, 2004.  **Exhibit A** starts as follows:  "On November 2, 2004 I met Mr. Haddad."  It then goes on to recite hearsay statements from other parties alleging that Plaintiff Charlie Haddad, spoke about pouring some beer on a player, but when asked specifically if he was going to do that he denied the same and there is no claim that he actually attempted to, let alone ever did.  The document is full of hearsay statements about the "personality" of Mr. Haddad.  Defendant has been using this document at discovery depositions, and has listed Mr. Smith as a witness.  It has zero prohibitive value as to the wrongful behavior of Jermaine O'Neal and Anthony Johnson in assaulting Mr. Haddad.  The assaults occurred 14 days later, and as disclosed below, neither Mr. O'Neal nor Mr. Johnson had the slightest knowledge of who Charlie Haddad was or what his past history was, nor by their own admission, was he threatening either of them in any way.

An accurate Statement of Facts for this case is found in the videos recording the brawl at the Palace of Auburn Hills.  Therefore, this Court will find a DVD Statement of Facts, and the Court may in its discretion, follow the DVD **(Exhibit B)** with a stop/pause button along with the DVD Statement of Facts.

## DVD STATEMENT OF FACTS

The DVD is approximately 1 minute, 25 seconds, and is a compilation of media video coverage coupled with two still pictures supplied by Defendant ANTHONY JOHNSON'S attorneys.  A reader of this Statement can follow the video by referring to the numbered video cuts; there are four in total, labeled 1, 2, 3, 4.  In the lower right hand corner there is a video clock which is referred to occasionally.

**Cut 1**. This segment first shows Ron Artest in the stands. This is a short time before the attack on Charlie Haddad by the Defendants, O'NEAL and JOHNSON, which occurs later at the other end of the playing court. The primary focus in this cut is not Artest, but rather on the man in the red shirt down at the bottom on the floor. He is a Palace employee and we first see him holding Defendant JERMAINE O'NEAL, who had testified that he wanted to go up into the stands and help the other players. A red arrow points to the Palace employee who is in a tangle with Defendant O'NEAL. O'NEAL eventually gives him a hard push backwards, throwing the employee off his feet and onto an adjacent table next to the playing floor.

**Cut 2.** Just after the Palace employee in the red shirt is thrown onto the table by Defendant O'NEAL, Ron Artest can be seen in this cut coming down out of the stands, heading towards the players' exit at the other end of the playing floor. Mr. Artest can be identified by his number 91. As Mr. Artest is walking in that direction, as are other players, the video switches to the large number of fans on the playing floor at the same time as the game is over. They are in close proximity to what is going to happen to Plaintiff CHARLIE HADDAD in a few moments. But first, Mr. Artest testified as follows:

> Q. "Did you see other people on the floor?
>
> A. I seen -- it was just people. I don't even -- it was people all around.
>
> …
>
> A. All I know is after I got out of the situation, I was watching our for those people and I was watching out for more people."
>
> **Deposition Transcript of Ronald W. Artest, p. 166, lines 2-5, and 21-24**

    Q.    (By Mr. Charfoos) "Did the game ever continue after these events?

    A.    No.

    Q.    The game was over?

    A.    Yes."

***Id.*** **at p. 169, lines 20-24**

After panning the fans, the video returns to Mr. Artest walking still towards the players' tunnel exit. At 032, a fan appears on the left of Artest in a blue hat and white jersey. He has been identified as Alvin Shackleford. He is a friend of the Plaintiff. He can be seen walking towards Mr. Artest. We then see Mr. Artest winding up as if to strike Mr. Shackleford and indeed, it looks as if he does physically come in contact with Mr. Shackleford, who then defends himself. At 035 the Plaintiff first appears on the video. He is quite short compared to Mr. Shackleford, and you will see him on the left of Mr. Artest and Mr. Shackleford. Charlie Haddad, the Plaintiff, attempts to stop Mr. Artest from hitting his friend. It appears as if he wants to restrain Artest from his attack. Artest seems to have no trouble shaking him off and pushing him down towards the floor.

    **(Artest)**

    A.    "But when I was there, you know, when I turned around, I seen this guy just walking towards me.

    Q.    And can you describe him to us?

    A.    At the time, I just seen he was big.

**(Exhibit C, Deposition Transcript of Ronald W. Artest, p. 161, lines 9-11, and 15-17)**

A. He had to be like 5-11.

Q. Heavy set?

A. Yeah. Maybe like 260 pounds."

*Id.*, **p. 162, lines 1-3**

Q. "Did he say anything to you?

A. He just flinched at me like he was about to punch me.

Q. What did you do?

A. I reacted, and I just threw a jab.

Q. What happened to him next?

A. I think it was his friend that attacked me from behind, if I'm not mistaken."

*Id.,* **p. 163, lines 13-15, and 21-25**

Q. "Did you ever see him?

A. No. I see on the videotape. But I felt it.

Q. You never saw him?

A. No.

Q. How did you get rid of the other guy?

A. I have not a clue.

Q. You don't know it you pushed him away or did what?

A. I can't even recall. I don't know how I got away. I just somehow got out. "

*Id.*, p. 164, lines 1-5, and 19-25

Q. "Do you remember having physically hit either of these two men?

A. No. I remember trying to protect myself, but none of my punches connected.

Q. So you did not physically hit either one of them?

A. If you recall brushing across the elbow or forearm a hit, then yes. But if you don't call it a hit. It was no, like, face. I didn't hit anybody in the face or anything like that."

*Id.*, p. 165, lines 1-11

**Cut 3.** After being pushed away, Plaintiff Charlie Haddad is seen on the floor. At the beginning of the cut, at 042, a man in a brown suit is entering from the right hand side of the screen. This is Defendant ANTHONY JOHNSON. He had been sitting on the bench in his civvies during the game because of a fractured hand, injured during a prior basketball game. Mr. Johnson drops on top of Mr. Haddad. He is then, rather quickly, pulled off by a Palace employee in a red shirt. Another gentleman in a red shirt is helping Mr. Haddad up. At around 048, the video then switches to the two stills supplied by ANTHONY JOHNSON'S attorney, being other views of the same. Johnson and Haddad are labeled. Here is the testimony of Defendant JOHNSON relevant to his interaction with Plaintiff Charlie Haddad:

**(Johnson)**

Q. "My understanding is that you had the misfortune of having a bad hand at the time of this game?

A. Yes.

Q. Tell us how that came about and what the nature of the injury was.

A. In the pre-season, I played a game against the Memphis Grizzlies, and I was defending a guy, and basically broke the fourth metacarpal in my right hand.

Q. And it was casted?

A. It had a soft cast on it."

**(Exhibit D, Deposition Transcript of Anthony Johnson, p. 17, lines 2-13)**

Q. "And would you sit in your city clothes or street clothes at each game, dressed as you were that evening?

A. Yes."

*Id.*, p. 18, lines 2-5

"And I saw guys confronting Mr. Artest…

*Id.,* p. 27, lines 15, 16

Q. "When you saw this man going towards Mr. Artest with his hand up, what did you do?

A. Due to the fact that it was another guy attempting to tackle Mr. Artest, you know, it was two guys attacking my teammate, and due to the fact that I was afraid for my safety and afraid for

        his safety, I made an effort to make sure that he was okay."

        *Id.*, **p. 29, lines 8-17**

Q. "Do you even know the names of these two men?

A. No."

        *Id.*, **p. 30, lines 22-24**

A. I had on dress shoes and I slipped.

Q. And once you were on top of him, what happened next? Did you hit him at all?

A. I made an effort to subdue him, and I immediately made an effort to get back up to my feet.

Q. And how did you make an effort to subdue him? What did you do?

A. Due to the fact I had a broken hand, I basically just wanted to basically physically grab the guy and get him under control.

Q. Did you hit him with you good hand?

A. No.

Q. And your left hand is your -- right hand is your dominant hand?"

A. Yes.

        *Id.,* **p. 32, lines 8-25; p. 33, line 1**

Q. "Is that the first physical contact you had with that guy that you fell on?

A. Yeah. That was the first contact I had with anyone.

Q. And that was literally falling on somebody?

A. Yes. Because I had on dress shoes I slipped."

*Id.*, **p. 32, lines 1-9**

Q. "Other than using his hands to try to get up, was he doing anything else at that time?"

*Id.*, **p. 33, line 19-21**

A. "Not to me.

Q. And somebody pulled you off, actually, didn't they?

A. I really don't remember that.

Q. You do remember getting up?

A. Yes.

Q. And you know what he did next?

A. No.

Q. Did you see Mr. O'Neal come into"

*Id.*, **p. 34, lines 3-10, and 25**

"the scene and the action?

A. I did not see that."

*Id.*, **p. 35, lines 1-2**

**Cut 4.** The cut starts with Mr. Johnson being pulled up by the gentleman in the red shirt. In the forefront of the picture, we see fans on the floor including what appears to be a mother and father and their young children watching the events. At 107, we see Charlie Haddad getting back onto his feet, he is still on his knees and he appears to be talking to Mr. Anthony Johnson. Suddenly, from the right a blurred figure comes running towards Mr. Haddad. It is Defendant JERMAINE O'NEAL, with his right arm extended. He physically punches the Plaintiff with his bare fisted right hand in the face knocking him backwards and onto the floor. At the time of the attack Defendant O'NEAL testifies he was 260 pounds, 6 feet 11 inches, and running fast **(Exhibit E, Deposition Transcript of Jermaine O'Neal, p. 17)**.

An overhead view of this infamous sucker punch starts at 118. Defendant, JOHNSON, is being pulled off Charlie Haddad and Charlie is starting to get up onto his feet.

The assault and battery by Defendants JERMAINE O'NEAL and ANTHONY JOHNSON are the cause of action claimed in this case.

## THE TESTIMONY AND DOCUMENT OF MR. SMITH ARE LEGITIMATELY SUBJECTS OF A MOTION IN LIMINE

During the discovery deposition in this case, counsel for Defendant INDIANA PACERS, has on several occasions asked witnesses, including the Plaintiff, about subjects covered in **Exhibit A**. For instance, Charlie's brother-in-law, Kris Siadi, was asked:

> Q. "Did you know if Charlie had ever threatened to throw beer on NBA players before that night?
>
> A. No.
>
> Q. Do you find that hard to believe?
>
> A. Yes."
>
> **(Exhibit F, Deposition Transcript of Kris Siadi, p. 17, lines 21 – 25)**
>
> Q. <u>You've never seen a report</u> where Charlie admitted he wanted to do that?
>
> …
>
> Q. <u>I'm asking you, had you ever seen a report</u> where Charlie admitted he wanted to do that?
>
> A. No.
>
> *Id.*, **p. 18, lines 1 – 2; lines 5 – 7**

**Exhibit A**, dictated by Mr. Smith, Director of Event Operations, begins by referencing information given by a Palace Security Supervisor Sam Kahl on November 2, 2004, and then goes into some language that Mr. Haddad allegedly used on that occasion.

There is no claim that the material in this document is taken from notes made contemporaneously with the time, but rather appears to have been first made when Mr. Smith "saw Mr. Haddad on the floor taking a punch from Mr. O'Neal via TV." **(Page 2 of Statement)** Mr. Haddad categorically denied that he was going to do anything or planned to do anything relative to throwing beer, and further stated that he was a season ticket holder "and spent $10,000 for his seats" and "didn't want to lose them." Mr.

Haddad said "that he had been drinking, and that he really wouldn't pour a drink on Yao Ming's head." Other than that single conversation by Mr. Smith, he has no personal knowledge of any impropriety on Mr. Haddad's part.

Plaintiff moves that his testimony and his exhibit be subject to a Motion in Limine and not be available to the jury in any way, form or manner without prior request to the Court, out of the presence of the jury.

## **LAW**

The proposed testimony and/or exhibit includes that Mr. Haddad had told someone, who told someone else, that he had considered pouring beer on Yao Ming is inadmissible hearsay, if offered for the truth of the matter asserted. FRE 801. To the extent that it is offered to simply show Charlie Haddad's state of mind at the time of the assault by Defendants, inasmuch as he also stated that in fact he was not going to do it, "he had been drinking and that he really wouldn't pour a drink on Yao Ming's head" it is as a whole, also inadmissible, and should be barred as being either irrelevant, under FRE 401, more prejudicial than probative, under FRE 403, or both.

It is noteworthy that the witness only thought the events and the conversation with Charlie Haddad were significant enough to memorialize them <u>after</u> the so-called "Palace brawl." Prior to that, there is no evidence that a contemporaneous recording of those statements was ever made; in fact, there is a complete absence of one. It is also clear that defendants cannot claim that Mr. Haddad ever poured beer on Yao Ming or any opposing player. Instead, they intend to use the statement to inflame the jury, because other people on the date of the Palace brawl, unquestionably poured beer on the Pacer

players as they left the court. Furthermore, defendant seeks to use the specific statement as evidence of the character of Mr. Haddad, despite the lack of any evidence that he was a beer throwing patron on the night in question. This is improper character evidence, and improper hearsay.

Therefore, the evidence is irrelevant. Under the Federal Rules of Evidence, FRE 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The words of an exuberant fan on nights other than the night in question has no consequence whatsoever to any of the facts which this jury will be called upon to adjudicate what happened to Mr. Haddad during the brawl. Plaintiff freely concedes that a full and fair cross-examination of Mr. Haddad is necessary for a full adjudication of this issue. However, what Charlie thought or did not think two weeks prior to the incident, is so remote from the actual situation (which is admittedly unprecedented, and has yet to be repeated) as to be totally irrelevant under FRE 401.

The Defendants may claim the earlier language is related, but there are no proofs to show relevance. For example, in Tompkin v. Phillip Morris USA, 362 F3rd 882, 897-898 (6th Cir., 2004), Plaintiff sought to challenge a trial court's ruling in limine to exclude evidence or allegations concerning the tobacco company's public relations arms' efforts to influence consumer expectations, and failure to warn of the danger of cigarettes. A mere assertion that a category of statements or documents is relevant to an array of issues, is not sufficient to make the evidence relevant, where the exact statement has no bearing on that which is to be decided by a jury in a given case. See also, Lacey v.

Doorstep Shelter Subsidiary of MES, 2006 WL 587828 (Ed. Mich. 2006) (attached as **Exhibit G**), [evidence relating to dissimilar claims or allegations, or to behavior of other people outside of the relevant time period, is irrelevant.]

Even if the statements had marginal probative value, then the inherent prejudice so exceeds the probative value and the possibility of jury confusion of the issues so great, as to warrant its exclusion under FRE 403. It is well settled that the "unfair prejudice" prohibited by Rule 403 does not refer to the protection against evidence that is merely prejudicial, in the sense of being detrimental to the party's case, however, evidence is unfairly prejudicial where it has an undue tendency to seek a jury decision based on an improper basis, especially an emotional one. Any evidence that appeals to a jury's sympathies, arouses its sense of horror, or provokes its instinct to punishment, or that may otherwise cause a jury to base its decision on something other than the established propositions in the case, is to be excluded. Carter v. Hewitt, 617 F2d 961, 972 (3rd Cir., 1980). Otherwise relevant evidence may permissibly be excluded if it serves to inflame the passions of the jury. United States v. Thomas, 49 F 3rd 253, 259, (6th Cir., 1995); Stern v. Shouldice, 706 F2d 742, 750 (6th Cir., 1983).

Another recent case, Pittman v. ANR Freight Systems, Inc., 47 Fed APPX 266 (6th Cir., 2002) (attached as **Exhibit H**) involved the trial court's decision to allow the defendant to go into the fact that Plaintiff stopped on the side of the highway prior to the accident, and that such stop was for non-emergency purposes. The twist is that Plaintiff had made the non-emergency stop to urinate by the side of the road, but had used the phrase he had stopped "to choke his chicken." Defendants sought to introduce this for the proposition that he had been masturbating rather than urinating, and thus, that Plaintiff

15

was the cause of the accident himself. The trial court termed this preposterous, unfairly prejudicial, and disallowed it. That disallowance was affirmed on appeal.

The level of preposterousness is similar in this case. Defendant seeks to introduce Plaintiff's statement when joking about pouring beer on Yao Ming as somehow indicative of why Plaintiff was assaulted during the Palace brawl when the Indiana Pacers were playing and Yao Ming was elsewhere in the United States.  In other words, this after-the-fact recollection of this incidental joking somehow led to Jermaine O'Neal deciding to run up to him and punch him, and Defendant Johnson slipping and falling on him.  The jury will be unfairly prejudiced because of the explicit appeal to the passions of the jury who might be effected by a statement about pouring beer on a popular, well-known basketball player. This reference to a specific act, one that Plaintiff himself never engaged in, but which other people did during the Palace brawl, needs to be excluded under FRE 403.

## **CONCLUSION**

For these reasons, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion in Limine, and prohibit any mention of prior statements of generalized intent, particularly a statement that Plaintiff intended to pour beer on Yao Ming, or any other player.

                                  CHARFOOS & CHRISTENSEN, P.C.

                              BY:   s/Lawrence S. Charfoos
                                  L.S. CHARFOOS P11799
                                  JASON J. THOMPSON P47184
                                  Attorneys for Plaintiffs
                                  5510 Woodward Avenue

        Detroit, MI  48202
        313-875-8080
        lcharfoos@c2law.com
        Attorneys for Plaintiff

Dated:  June 30, 2006

### CERTIFICATE OF SERVICE

    I hereby certify that on June 30, 2006, I presented the foregoing Motion in Limine and Certificate of Service to the Clerk of the Court for filing and uploading to the ECF system which will send notification of such filing to the following: Brian M. Akkashian @ bakkashian@dickinsonwright.com; Richard M. Apkarian @ rapkarian@dickinsonwright.com; Hiaeaki Sano @sano@millercanfield.com; and Steven M. Potter @ spotter@potterlaw.com; notice will be delivered by other means to:  NONE

        s/Lawrence S. Charfoos
        L.S. CHARFOOS P11799
        JASON J. THOMPSON P47184
        Attorneys for Plaintiffs
        5510 Woodward Avenue
        Detroit, MI  48202
        313-875-8080
        lcharfoos@c2law.com
        Attorneys for Plaintiff

This will also certify that on June 30, 2006 the undersigned served a copy of the DVD outlined in the DVD Statement of Facts upon:

| | |
|---|---|
| Hideaki Sano | William D. Temko |
| 150 West Jefferson Ave. | 355 South Grand Ave. |
| Suite 2500 | 35th Floor |
| Detroit, MI  48226 | Los Angeles, CA  90071-1560 |

| | |
|---|---|
| Richard M. Apkarian<br>500 Woodward Avenue<br>Suite 4000<br>Detroit, MI  48226 | Steven M. Potter<br>2701 Cambridge Court<br>Suite 223<br>Auburn Hills, MI  48326 |

By enclosing said documents in an envelope and placing the envelope in the U.S. mail with the proper postage thereon.


                                           s/Patricia A. Cotton