**Condensed Transcript**

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

MELVIN KENDZIORSKI,

    Plaintiff,

vs.

Civil Action File No. 2005-064008-NO

INDIANA PACERS, an assumed name for PACERS BASKETBALL CORPORATION, an Indiana corporation; JERMAINE O'NEAL, an Indiana resident; JAMAAL TINSLEY, an Indiana resident; and JOHN GREEN, a Michigan resident, jointly and severally,

    Defendants.

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES HADDAD,

    Plaintiff,

vs.

INDIANA PACERS, an assumed name, a/k/a PACERS BASKETBALL CORPORATION, an Indiana corporation, JERMAINE O'NEAL and ANTHONY JOHNSON, Jointly and Severally,

    Defendants.

Civil Action File No. 04-CV74932
Hon. Anna Diggs Taylor
Mag. Judge Donald A. Scheer



**setdepo**
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

JOHN F. ACKERMAN, JR.,

    Plaintiff,
vs.

Case No. 04-062545 NO
Hon. D Langford-Morris

INDIANA PACERS, an assumed name for PACERS BASKETBALL CORPORATION, an Indiana Corporation, RON ARTEST, STEPHEN JACKSON, JERMAINE O'NEAL, DAVID HARRISON and THE PALACE OF AUBURN HILLS, an assumed name for PALACE SPORTS & ENTERTAINMENT, INC., Jointly and Severally,

    Defendants.

**VIDEOTAPED DEPOSITION OF**

**RONALD W. ARTEST, JR.**

January 25, 2006
9:00 a.m.

125 South Pennsylvania Street
Indianapolis, Indiana

Blanche J. Harris, CCR No. B-2290



**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

### 161

1 really just looking around to see who was
2 coming towards me.
3    Q.   Were you aware that fans were
4 coming onto the floor?
5    A.   At first, I wasn't. When I looked
6 at the videotape, I was walking. And as I
7 was walking, looking in another direction,
8 somebody was walking towards me.
9         But when I was there, you know,
10 when I turned around, I seen this guy just
11 walking towards me.
12    Q.   Did you notice fans, other than
13 this fan, walking towards you?
14    A.   I seen -- no, just him.
15    Q.   And can you describe him to us?
16    A.   At the time, I just seen he was
17 big.
18    Q.   Did he wear anything? Did he have
19 a hat on?
20    A.   I can't remember if he had
21 anything on.
22    Q.   You're 6-6, did you say?
23    A.   Yeah.
24    Q.   And how big was he in relationship
25 to you?

### 162

1    A.   He had to be like 5-11.
2    Q.   Heavy set?
3    A.   Yeah. Maybe like 260 pounds.
4    Q.   Do you remember if he was wearing
5 anything that you remember?
6    A.   He had a jersey on.
7    Q.   Do you remember what it said?
8    A.   No. I just remember it had to be
9 a Detroit Pistons home jersey.
10    Q.   Were you walking or running when
11 this occurred?
12    A.   I was walking.
13    Q.   Were you talking to anybody?
14    A.   Nobody.
15    Q.   The crowd still noisy and loud?
16    A.   I can't recall. Most likely, yes.
17    Q.   As this gentleman came towards you
18 -- by the way, we believe his name to be Mr.
19 Shackelford. Have you ever learned that name?
20    A.   Shackelford who?
21    Q.   The guy coming towards you. Alvin
22 Shackelford. What's his first name?
23         MR. THOMPSON: Not Shackelford.
24    Q.   (By Mr. Charfoos) The guy coming
25 towards you. The big guy. Do you know his

### 163

1 name?
2    A.   Who's the guy? He's big too?
3         MR. RUBIN: Forget about the name.
4 The guy just coming after you. Whoever it
5 is.
6         THE WITNESS: I seen somebody
7 coming at me.
8    Q.   (By Mr. Charfoos) You don't know
9 his name?
10    A.   No.
11    Q.   You didn't talk to him?
12    A.   No.
13    Q.   Did he say anything to you?
14    A.   He just flinched at me like he was
15 about to punch me.
16    Q.   Show us what he did, on the video
17 -- I mean for the video.
18    A.   He went like this (indicating).
19 He was walking towards me in an aggressive --
20 and went like this. Balled his fist up.
21    Q.   What did you do?
22    A.   I reacted, and I just threw a jab.
23    Q.   What happened to him next?
24    A.   I think it was his friend that
25 attacked me from behind, if I'm not mistaken.

### 164

1    Q.   Did you ever see him?
2    A.   No. I see on the videotape. But
3 I felt it.
4    Q.   You never saw him?
5    A.   No.
6    Q.   Do you know how big or tall or
7 short he was?
8    A.   When I see him on the tape, I
9 just see --
10    Q.   No. Not on the tape.
11    A.   No. He had some strength, though.
12 He grabbed me pretty strong.
13    Q.   Where?
14    A.   Around my back, waist.
15    Q.   Was this after you had had some
16 kind of contact with Mr. Shackelford?
17    A.   It was at the same time. They
18 was attacking me together.
19    Q.   How did you get rid of the other
20 guy?
21    A.   I have not a clue.
22    Q.   You don't know if you pushed him
23 away or did what?
24    A.   I can't even recall. I don't know
25 how I got away. I just somehow got out.



setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

165

Q. Do you remember having physically hit either of these two men?
A. No. I remember trying to protect myself, but none of my punches connected.
Q. So you did not physically hit either one of them?
A. If you recall brushing across the elbow or forearm a hit, then yes. But if you don't call it a hit. It was no, like, face. I didn't hit anybody in the face or anything like that.
Q. Did you see what happened to the bigger guy?
A. They both big. They was both, like, the same size.
Q. Did you see what the first one did that you saw, then?
A. On the tape, you know, I seen --
Q. No, not on tape.
MR. RUBIN: He's asking what you recall.
THE WITNESS: No. I didn't see.
Q. (By Mr. Charfoos) All right.
A. I was just still -- after I got out that situation, I was looking for more

166

people who was coming after me.
Q. Did you see other people on the floor?
A. I seen -- it was just people. I don't even -- it was people all around.
Q. Did you see what Anthony Johnson did after you had the contact with the big guy?
A. No.
Q. Did you see what Jermaine O'Neal did after you had the contact with the big guy?
A. Not on tape; right?
Q. Not on tape.
A. No. No.
Q. So you cannot help us for purposes of these claims to tell us anything about what Anthony Johnson did or Jermaine O'Neal did regarding these two men that had their hands near or on you?
A. All I know is after I got out of the situation, I was watching out for those people and I was watching out for more people.
Q. No problem. We just have to make

167

this record and make sure that there's not something you know that we don't know.
MR. RUBIN: Mr. Charfoos, would it be a fair question to ask him -- is that you didn't see with your own eyes the events that happened with Mr. Johnson or Mr. --
THE WITNESS: I don't remember if I seen them or not.
Q. (By Mr. Charfoos) Today, you can't tell us anything about it?
A. Yeah. I can't remember if I seen it or, you know --
Q. Or saw it on the tape?
A. Yeah.
Q. When this first guy who came to you when you made the motions when you just stood up, how far were you from the end of the court; do you know, feet wise?
A. I don't know.
Q. More than 10 feet, more than 15 feet?
A. Probably free throw line extended, you know, three point line extended. I was probably at the top of the three point line. Probably 10 feet, 12 feet, maybe 15, 20.

168

I'm not sure. Something like that.
Q. You've used the term stepping back. Did you consider when you stepped back that's meaningful in some way, form or manner?
A. When did I use that term?
Q. Regarding Mr. Wallace's incident with you.
A. Repeat the question, please.
Q. Yeah.
What do you mean when you say, "I was stepping back"?
A. Oh, just stepping back, moving away from him.
Q. Is that a sort of sign that you're not interested in participating in some kind of physical altercation? Is that a sign of saying, "I'm backing off"?
A. Yeah, definitely.
Q. And finally, you used the term sucker punch. What's your definition of a sucker punch?
A. What the guy did to me in the stands.
Q. Tell me.
A. He was just grabbing me and just


setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

**169**

1  punched me in my face.
2     Q.  Why do you call it sucker punch?
3     A.  I think that's from behind.
4     Q.  You don't have a chance to do
5  anything about it?
6     A.  No. I think it's only from
7  behind. It was, like, from behind, you know.
8     Q.  If you were to be asked in general
9  what a sucker punch is, what do you consider
10 a sucker punch?
11    A.  Being punched from behind.
12    Q.  Where you don't have a chance to
13 do anything?
14    A.  From behind, you don't know what's
15 going on. Just from being punched from
16 behind.
17        MR. RUBIN: Keep your voice up.
18 I know it's getting late in the day.
19        THE WITNESS: All right.
20    Q.  (By Mr. Charfoos) Did the game
21 ever continue after these events?
22    A.  No.
23    Q.  The game was over?
24    A.  Yes.
25        MR. CHARFOOS: I have no further

**170**

1  questions.
2        EXAMINATION
3  BY-MR.WEISS:
4     A.  Mr. Artest, my name is Steve
5  Weiss. I represent your teammate, Stephen
6  Jackson. And I just have a couple of
7  questions for you.
8        MR. RUBIN: Mr. Weiss, could you
9  keep your voice up, because I can't hear you
10 over here.
11    Q.  (By Mr. Weiss) Mr. Artest, I want
12 to take you back to the point in time where
13 you had gone into the stands, and you were
14 in the vicinity of the person that had
15 cheered when you were struck by the beer;
16 okay?
17        And I think after that point in
18 time, you testified that you were grabbed by
19 someone from behind, and grabbed by several
20 other people at the same time.
21    A.  Yes.
22    Q.  And at that point in time, you
23 felt like you were under attack; is that fair
24 to say?
25    A.  Definitely.

**171**

1     Q.  And did you feel in fear for your
2  physical safety?
3     A.  Definitely.
4     Q.  And are you aware at that time
5  that your teammate Stephen Jackson had come
6  into the stands to come to your aid?
7     A.  No. I was just trying to leave.
8     Q.  Since that time, have you become
9  aware that Stephen Jackson came up into the
10 stands to help you?
11    A.  Yes.
12    Q.  And given the mood of the crowd --
13 which I think you characterized as angry or
14 hostile at that point -- do you think it was
15 a brave thing for Stephen Jackson to do, to
16 come up to your aid?
17    A.  It was the right thing and brave
18 thing; yes.
19    Q.  And are you grateful that he did
20 that?
21    A.  Yes.
22        MR. WEISS: Thank you.
23        EXAMINATION
24 BY-MR.SMITH:
25    Q.  Shawn Smith for Mr. Green, real

**172**

1  quick. You talked earlier regarding the push
2  from Ben Wallace as being on the street, it
3  would be a crime, and on the court it's not
4  a crime.
5        Do you recall that?
6     A.  Yes.
7     Q.  When he threw the band from his
8  wrist and it struck you in the eye, causing
9  an injury to your eye, you will agree that
10 that's not appropriate conduct for a player
11 on the court; correct?
12    A.  Not appropriate.
13    Q.  Not even -- on the street that
14 would be a crime, and on the court that
15 would be a crime?
16        MR. RUBIN: I'm going to object.
17 If you know if it's a crime, you can answer
18 the question.
19    Q.  (By Mr. Smith) In your personal
20 opinion, based on what you said about Ben
21 Wallace's push, his actions as it relates to
22 the band being thrown at you, using that same
23 analogy you used on your own earlier, just
24 real quickly, do you feel that that was, A,
25 appropriate, or, B, a crime?



setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com