

The University of Michigan

**Stanley Berent, Ph.D.**

Neuropsychology

1500 East Medical Center Drive
Ann Arbor, MI 48109-0840

Telephone: (734) 763-9259
Fax: (734) 936-9262
sberent@umich.edu

May 27, 2006

Steven M. Potter
Potter, DeAgostino, O'Dea & Patterson
2701 Cambridge Court, Suite 223
Auburn Hills, MI 48326

JUN 1 2006

Re.: Charles Haddad
Our Reg. No.: 3642 291 9

Dear Mr. Potter:

    In response to referral, I saw the above named 22 year old gentleman for purposes of neuropsychological evaluation on April 19, 2006. In addition to formal psychometric examination, my evaluation consisted of a patient history and interview. In reaching my conclusions, I also reviewed a number of records which were provided by your office. Although not limited to, these consisted of medical and psychological records from the following:

    American Medical Response
    Pontiac Osteopathic Hospital (POH)
    Valley Urgent Care
    Joel Beltrain, DO
    William Beaumont Hospital
    Covenant Health Care/Cooper Campus
    John J. Kemerer, DO
    Bong Jung, MD
    Bradley Sewick, Ph.D.
    Internal memo Timothy Smith, Director of Event Operations at Palace of Auburn Hills
    Joel Beltran, DO, Neurologist.
    Biren A. Shah, MD
    James Weintraub, DO; Neurologist.
    Academic Records from Chesaning Union High School
    Deposition, part 1, Charles Haddad

    There may be records that would be important to my analyses in this matter but that I have not yet seen. For instance, I would like an opportunity to review the raw scores and forms from past neuropsychological evaluations the plaintiff received, or may have received (e.g., scores and forms from Dr.Sewick's 2004 examination [report dated 3/15/2005]). Also, the plaintiff was evaluated, perhaps several times, while in school, e.g., 1992, 1995, and 1997. I would like to see the forms and scores that underlie these evaluations as well. Should these or other additional records become available, I would like an opportunity to review them. Upon further review, I may provide a supplemental report if called for at that time.

    I explained, and the plaintiff indicated his understanding, that my examination

represented a neuropsychological evaluation at the request of the defense law firm and that the report of my findings would be sent to that firm. While I would be conducting a standard clinical evaluation as part of the examination, I would not become a treating clinician. I also explained that I would be reviewing various medical and other records that had been sent to me by the defense firm, including reports of past examinations, and that I might refer to those records in my report. Also, I indicated that I might be requested to testify about the results of my examination. I recommended to the plaintiff that he review my report, indicating that he could most likely obtain a copy of the report from his attorney.

I will briefly summarize the results of my evaluation below. Please feel free to contact me if I can provide further detail or elaboration.

**Neuropsychological Evaluation**

**Interview and History**

Information from interview. The history provided to me by this person is fairly lengthy, and I will not repeat it here in entirety. Other history is contained in my notes from interview. Briefly, Mr. Haddad listed his chief complaints as "forgetting, hypersensitive to light and sound, feels like a different person." With regard to his complaint about forgetting, he said that his memory is of concern more generally, that he forgets to pay his bills, to call back on his phone messages, or what he was going to say to someone. He added that his memory difficulty comes and goes, that sometimes his "short-term memory" is fine but that this ability "comes and goes." With regard to his sensory hypersensitivity, he said this used to include his sense of smell but that problem stopped abruptly, "like if a pizza timer goes off." With regard to feeling like a different person, he reported that this is variable, from fatigue to energetic. He believes he has become less aggressive than in the past, and that people that know tell him he seems like a different guy than in the past. (Note here, a buzzer sounded at this time, with no observable reaction on his part, even though the sound startled me).

In reviewing his complaints, he said he respects his doctors but does not like to take the medicines he has been prescribed and, in fact, tries to not take them. Some of his medications have left him feeling drowsy, he said. In addition, some of his medications produced a tingling sensation in extremities. He said he is bothered by the side-effects of some, stating that he has sleep walked while taking Ambien. He listed his current medications as including Topamax and Imitrex (both are used to treat migraine headache). Later in the interview, he added a medicine for nausea, "Skelaxin." Also, he said he took vicodin for a period but is no longer using this drug for pain. He said he experiences periods of tiredness and feels there has been no change in his symptoms since his injury in November 2004. Then, he added that his symptoms go "up and down" in terms of severity. He complained of "migraines" and said he had no migraines before this incident, took no medications, and had no other symptoms before. I commented on and asked him about several scars that were visible in his face. He responded by saying that he had his nose broken by his brother when he was 7 years old. Two more scars on the right side of his face, he said he did not remember how he got these. He added that he has a scar on the right knee from a football injury when he was young. In response to my question, he said he had no other past illnesses or injuries other than those just mentioned.

In terms of the incident in 2004, the plaintiff stated that does not remember what happened in the actual altercation. He does recall driving to the game with one of his friends, "AJ," and the two of them walking to the Palace, then, nothing more. He said, however, that he

has watched himself on television since that time and knows more about it as a result. His next actual memory was waking up in the hospital, he reported. Then, he added that he can recall "bits and pieces" of the events, saying he was hit in the face with a fist, and in the side but adding, "But really don't remember." Then, he said, someone else hit him, then that multiple people hit him. He said that he thinks this but that the information came from watching videos. He finished his description of the incident by saying that he "was in shock that night."

The plaintiff's full name is Charles Frank Haddad. He was born and raised in Saginaw, Michigan and lives presently in Burt, Michigan. He is single, has never been married, has no children and no significant other at this time. In terms of education, he stated that he competed 11 years of formal education and is presently working on getting a GED. He said he got a lot of "C" and "D" grades while in school. (NOTE: formal records provide more detail regarding his past school performance). He said he played sports all through high school, with no injuries. He lives with his parents, a sister and her husband and child. He likes the living arrangements. His father is in good health and owns a store, where the plaintiff works. His mother manages the store and also is in good health. He has a brother and two sisters, all in good health. They are all college graduates. The brother owns a store. One sister is a manger in an insurance office and the other works in one of the stores.

The plaintiff denied past history of seizure or high fever. He reported seizure disorder in a few cousins, however. He complained of suffering a head injury (during the 2004 incident described earlier). He denied any other incidents of head injury, fractures, or other serious injury. Also, he denied past hospitalization or surgery, as well as history of emotional or neurological illnesses in self or family. He complained of sleep related difficulties. He complained of headaches (2 to 3 times a week), rating the severity of his head pain as a 4 on a 5 point scale. He is able to drive, handle his own finances and other personal self-care. He said he visits regularly with friends and family. He said he has never smoked and that drinking was never a problem for him, adding he does not now drink. He denied abuse of drugs.

On further questioning, he said that he thinks he has experienced a few periods of altered consciousness, but his descriptions were not clear. He said he is able to work, but for shorter periods than before the incident. He said he works for his father, who has been paying him on the basis of what the father believes he has earned. He denied difficulties with coordination. He thinks he is less happy and less enthusiastic about things than in the past.

The plaintiff said he has had examinations similar to today's 2 or 3 times in the last year or two, the most recent being by Dr. Sewick about two months ago, in December, 2005 he believes. (NOTE that this last examination, if it took place, was close in time to the present one and that factor will need to be considered in the present interpretation.).

Some information from historical records. Additional information from my review is contained in my notes. Mr. Haddad's date of birth is 8/7/1983. School records I have reflect a history of learning disability (LD). He was apparently first evaluated for learning difficulties in 1992, when he was in the third grade. His general ability at that time was determined to be above average (Binet IV: 113), with deficits in reading and language arts. He was placed in special education classes at that time. He was evaluated again in 1995, in about the 6th grade, and found to have a WISC-III FSIQ = 98 (average), with PIQ = 111 (above average) and VIQ = 88 (lower end of average). Aptitude testing at that time revealed areas of deficit that included basic reading (grade equivalency [GE] 2.1, reading comprehension (GE 2.8), spelling (GE 2.9), written expression (GE 1.2). Math was seen as adequate. It was noted that difficulties were present also in motivation, attitude, effort, and general behavior. Attention deficit disorder was

considered. In 1997 (approximately 9th grade), frustration and exasperation were reported, with significant difficulties in reading noted. His awareness of these difficulties was seen as less than ideal at the time and contributory to his problems in school. His test results were consistent with continued classification as specific learning disability (SLD) and special education services. His FSIQ was measured to be 90, with PIQ = 107 and VIQ = 78. Borderline to deficit aptitude was noted in language areas, including fund of information (7), abstraction (SIM: 6), Vocabulary (4), Comprehension (5); whereas his performance in non-language areas ranged from average to above. His achievement test scores were consistent with aptitude in terms of pattern, with very low scores in most language areas (e.g., reading, spelling, reading comprehension, and writing). Math scores were average, however. His 10th grade testing in comparison to college bound students, again showed very low percentile scores in reading and other language areas, with relatively much better scores in Math related areas. In 2000, he had earned relatively few high school credits, was behind his projected grade placement, and was recommended for evaluation and medicinal treatment for attention deficit hyperactive disorder (ADHD). His overall GPA in 2001 was 0.779, a score that would place him in the failure range.

I do not have detailed records, but an emergency department (ED) note from 6/14/1999 indicated treatment for laceration to the scalp, without loss of consciousness (LOC). He received sutures to close an acute scalp laceration.

Records from 11/19/2004 reflect that he was taken to the Pontiac Osteopathic Hospital (POH), with described altered consciousness and head injury, complaints of neck and back pain. Despite the altered consciousness, the report said he complained of having been assaulted to the left side of his face and neck. Also, he complained of abdominal pain. Also, he was listed as alert and oriented times 2, with a Glascow Coma Scale (GCS) of 13. There were no fractures, no alcohol, and no neurological deficits found by EMS). The ED note of this same date indicated he was combative, GCS = 14 and positive for alcohol. He was listed as having been allegedly assaulted at the Palace, with contusions to the head, face, abdomen, and neck, and the clinical impression was listed as status post assault with closed head injury (CHI). It was noted that he remembered coming to the hospital.

Imaging studies (CT, 11/20/04) were negative for head, C-spine, and pelvis. CT of facial bone showed mild bruise over left maxillary bone.

11/22/04, he complained of HA since the incident and pain on turning head.

11/28/04. ED note. Complaints of continuing headache (HA), located in posterior occipital region bilaterally, with radiation up the temporal lobe area. HA interfered with sleep. Social history mentioned occasional alcohol use. Exam was said to be consistent with post concussive syndrome secondary to altercation. Another CT was negative.

The plaintiff underwent neuropsychological evaluation on 12/24/04 by Dr. Sewick, who concluded post-concussive syndrome secondary to the 11/19/04 CHI. Also, he diagnosed a mood disorder secondary to the injuries he received in the 11/19/04 incident. Dr. Sewick recommended (additional) rehabilitation, including psychotherapy, psychiatric evaluation and treatment, and neurological care (no specifics given, and I may not have records that reflect all treatments he had received to that date or after). Dr. sewick reported WAIS III IQ scores of FSIQ = 80, PIQ = 79, and VIQ = 79. Although it is unclear how Dr. Sewick was able to administer an MMPI-2 given the plaintiff's chronic low language abilities, he did so and reported that "neurological items" were in the positive direction. Dr. Sewick did acknowledge the history of developmental problems, and he distinguished these from what was termed "acquired"

problems, listing the latter as including "tactual sensory-perceptual dysfunction, worse on the left; bilateral dysnomia, worse on right; impaired attention, impaired recent memory, impaired abstraction, judgment and executive functions; sleep disturbance; pain; fatigue; reduced ego strength; depression; post-traumatic anxiety; and impaired conation."

Several ED visits were recorded in 2005, with requests for medications and continuation of complaints. He had an EMG/NCS on 6/15/05 because of his complaints of numbness in right knee. No abnormality was found, and no evidence for lumbar radiculopathy.

Dr. Weintraub (11/23/05) diagnosed findings consistent with post-traumatic variant cephalgia, along with post-traumatic syndrome, and post-traumatic cervicogenic HA. Dr. Weintraub commented on the need to reduce use of ED and to reduce use of abortive medications. Also, he stressed the need for the plaintiff to address his depression, anxiety, anger, difficulties with concentration and memory, and other neurocognitive issues. He administered a Beck Inventory (Score 41). He planned to refer the plaintiff to the behavioral medicine department, but I have seen no records from such follow-up. Dr. Weintraub recommended tapering or discontinuing a number of medicines the plaintiff was taking (Zonegran, Vicodin, Advil, Maxalt, and Ambien), and he started him on others (Topamax, Pamelor, Migranal nasal spray, abortive drugs: Indocin, Phenegran, Skelaxin, and Imitrex for extreme pain).

12/6/05. An MRI of the brain was reported to be normal.

**Psychometric Examination (Results of neuropsychological testing)**

The word "psychometric" refers to measurement of psychological attributes, and the psychometric examination is part of the neuropsychological evaluation that employs formal tests and related procedures to objectively quantify the individual's behavior in a number of key areas of behavior. Tests and procedures were chosen based upon professional standards (Berent, 1991, Filskov and Boll, 1983, 1985; Lezak, 1983, 1995) that include consideration of the individual's age as well as the specific test's technical criteria of validity (i.e., how well the test measures what it purports to measure), reliability (i.e., consistency of numerical scores derived from the test), standardization (i.e., availability of a standard prescribed procedure for test administration), and availability of normative data (i.e., data against which to compare the individual's performance). The battery reflected tests that are used routinely by neuropsychologists in clinical practice, and the tests were administered in a manner consistent with specified standards of practice (e.g., APA, Am. Psychol., 1987). Tests were also chosen on the basis of providing measures of behavior in key clinical domains that include general intellect (e.g., Wechsler scales), Language (e.g., vocabulary, verbal fluency), cognition (e.g., Wechsler scales), motor and psychomotor functioning (e.g., Block Design, Trails A & B), achievement (e.g., WRAT), coping and emotional functioning (e.g., MMPI-2, SCL), and general mental status (e.g., MMSE). It is important to note that these tests are sensitive measures of behavior but are not specific to any given disease or disorder. The data that are derived from psychometric examination are useful clinically to the extent that they are considered within a framework of differential diagnosis and with consideration of information obtained from clinical interview, history, and other clinical tests and reports. The test battery included the following procedures:

| | |
|---|---|
| Wechsler Adult Intelligence Scale - III (WAIS-III): | Self-Rating Scale |
| Incomplete sentences, (short form) | Speech sounds and Seashore |
| TOMM and Rey-15 | Finger Tapping and Grip Strength |
| Wide Range Achievement Test 3 (WRAT-3)    SCL-90-R | Grooved Pegs |
| Verbal fluency | Trails Test, A and B |
| Wisconsin Card Sort Test (WCST) | Mini-Mental Status Examination (MMSE) |
| Wechsler Memory Scale-III (WMS-III) | |

Since our tests are not specific to brain dysfunction, factors other than brain function must be considered in arriving at a conclusion about what caused a low score on a given test (Berent & Albers, 2005). Attention and motivation are two factors important to such a process of differential diagnosis. With regard to a person's attention, attention may vary from moment to moment for a variety of reasons that range from the individual's mental approach to a particular test or type of test, to momentary distractions caused by external events or even thoughts the person might be having at that instant. With regard to motivation, our tests are volitional in nature. This means that accurate performance depends not only on the person's ability to complete the tasks presented, but it also depends on the person's cooperation and effort. The individual's motivation, therefore, is extremely important in the neuropsychological examination, and motivation can even explain a given test score in part or in whole. A variety of factors can influence a person's motivation in taking a series of tests. These factors include such things as how much rest the person has had before entering the test situation, how attentive they might be on a given occasion, whether they are hungry or thirsty, the nature of rapport the individual might have with the examiner, their mood on a given day, and being involved in litigation (Berent & Swartz, 1999; Berent & Trask, 2000).

Of course, malingering can also be a motivational factor. In this particular instance, the plaintiff scored below the cutoff score on two of three tests designed to gauge the adequacy of effort in his approach to the tests. While I did not conclude that the plaintiff was malingering on the basis of these test scores, the results do indicate a probable less than optimal effort on his part. The consequent conclusion is that some of his scores may represent an underestimate of his actual ability. I will discuss these factors as they become relevant in the remaining portions of this report.

**Test Results**

From a general intellectual viewpoint, the plaintiff reflected a mixed picture, with borderline to below scores in verbal areas of the WAIS-III but average level performance in less verbally dependent portions of the test (WAIS-III FS= 80, VIQ=77, PIQ=90 [mean = 100, standard deviation = 15]). In terms of general index scores, Perceptual Organization was normal and average (POI: 97). His WAIS-III based working memory index (WMI) was low average (84, 14th percentile); but Verbal Comprehension (VCI) was at the low end of the borderline range (72, 3rd percentile), and Processing Speed (PSI) was low as well, in the low average to borderline range (81, 10th percentile).

In terms of subtest scores on the WAIS-III, about half of the subtests were below a scale score of 7, the usual cutoff for normal. Vocabulary (4) was his lowest subscale score, followed by Similarities (5), a task that demands good abstract conceptualization and verbal based logic. All of the remaining verbal subtests were below a scale score of 7, with the exception of Arithmetic, a task that demands good arithmetic ability but also relatively good concentration and short-term memory. His score on Arithmetic (10) was at the average level. He performed relatively much better on the non-verbal portions of the WAIS-III. His only score below the normal cutoff was Digit Symbol (6), a task that does have a verbal-like component in that it is a coding test that demands translation of numbers into symbols. The remaining subtests in this part of the WAIS-III were all in the normal range. These included Picture Completion (8), a task that demands visual perceptual based reasoning and sustained concentration; Picture Arrangement (8), a task that calls for visual perceptual reasoning and concentration; Symbol Search (7), another task calling for visual-based concentration, vigilance, and decision making. His highest scores on this portion of the test were Matrix Reasoning (10), a non-verbal problem

Haddad, Charles: Page 6 of 11

solving task; and Block Design (11, his highest sub-scale score), which demands visual-motor problem solving as well as concentration and working memory.

It will be very desirable to obtain the scores from the plaintiff's past neuropsychological examinations in order to compare those with the present scores. With regard to scores that were included in some of his past reports, Dr. Sewick, in his 2004 examination, reported some scores he obtained with the WAIS-III. Dr. Sewick's scores (WAIS-III FS= 80, VIQ=79, PIQ=86) were essentially the same as those I obtained (WAIS-III FS= 80, VIQ=77, PIQ=90). Also, some scores were available in the reports of the plaintiff's performance while he was in school (1995, 1997). His scores from the children's version of the same test used by Dr. Sewick and myself, the WISC-III for 1995 were as follows: WISC-III FS= 98, VIQ=88, PIQ=111. His general index scores on the WISC reported in 1997 were as follows: WISC-III FS= 90, VIQ=78, PIQ=107. More important, some subtest scores were presented in the report of the 1997 test administration. These included the following: Information (7), Similarities (6), Arithmetic (8), Vocabulary (4), Comprehension (5), Picture Completion (10), Coding (9), Picture Arrangement (12), Block Design (15), Object Assembly (9).

Some normally expected differences exist between the adult and children's version of the Wechsler scales. Nevertheless, the scores for those tests that overlap between the plaintiff's 1997 and 2006 examination show striking similarity to one another (see comparison table).

**Comparison of scores on some tests between 1997 and 2006 examinations.**

| Test | 1997 | 2006 |
|---|---|---|
| VIQ | 78 (borderline) | 77 (borderline) |
| PIQ | 107 (average) | 90 (average, although lower than in 1997) |
| Vocabulary | 4 (below normal) | 4 (below normal) |
| Similarities | 6 (below normal) | 5 (below normal) |
| Arithmetic | 8 (normal) | 10 (normal) |
| Information | 7 (normal - borderline) | 6 (Slightly below normal) |
| Comprehension | 5 (below normal) | 6 (slightly below normal) |
| Picture Completion | 10 (normal) | 8 (normal) |
| Picture Arrangement | 12 (normal) | 8 (normal) |
| Block Design | 15 (normal) | 11 (normal, although lower than in 1997) |

Overall, the results of intellectual testing are impaired. The test impairments noted are not general. Rather, they reflect poor performance on most verbal tasks, with normal level performance on visual motor problem solving and other non-verbal, performance oriented tasks. These findings are consistent with the plaintiff's history of selective learning disability that was identified in his educational history. Although some scores are lower than in 1997, the pattern of strengths and weaknesses reflected between his present results and those reported in his educational history are remarkably consistent, including the relative, and isolated strength in arithmetic in comparison to reading and other language based areas. The relatively lower scores on some performance tasks today in comparison to his historical record are not dramatic and are most likely the result of less than optimal effort, as reflected in our formal tests of effort.

<u>Language</u> functions. His vocabulary level, as already mentioned, was very low (SS=4, > 2 SD below the mean). His reading level also was very low (SS=64, 1st percentile, 3rd grade level), as was spelling (SS=67, 1st percentile, 4th grade level). Arithmetic aptitude was identified earlier as a special strength. Consistent with that aptitude, his achievement score, while still relatively low in comparison to the general population, is relatively higher than his other achievement scores ((SS=82, 12th percentile, 6th grade level). The plaintiff was normal by observation in interview in both receptive and expressive use of language. His comprehension may be relatively limited, as reflected in the WAIS-III subtest score (SS=6). His written communication was judged to be consistent with his educational history and achievement test results. When asked to write in cursive, he chose to print. His printing is legible, acceptably neat, and reasonably well oriented on the page. There are some grammatical errors noted, and the content of his productions is stilted. Verbal fluency on formal testing was low (12th percentile). All language portions of the MMSE were performed normally, with the minor exception of leaving out the word, "or" when asked to repeat a five word statement that was read to him.

Overall, the plaintiff reflected language difficulties that were consistent with his educational history, in general and with regard to his past designation of specific learning disorder.

<u>Cognitively</u>, the plaintiff reflected a normal mental status (MMSE= 28 of 30). He missed only one of five items on serial sevens subtraction (a task that also demands good sustained concentration and coordination of working memory and calculation). He was able to learn three objects and repeat these initially and on delayed recall. He was very well oriented to his surroundings and able to concentrate and follow instructions. He preformed normally on the MMSE in terms of attention, calculation, visual construction, and language; in addition to the other portions of this test already mentioned.

Abstract concept formation was relatively poor, as reflected on WAIS-III Similarities (5). Low vocabulary and other verbal skill limitations in addition to abstraction could have contributed to his low score on Similarities. Complex problem solving ability, at least on the tests administered in this examination, appeared to be normal, e.g., Block Design (11), Matrix Reasoning (10), and (WCST: 5 categories). One exception to normal in the area of problem solving area was LN Sequencing (6), a somewhat demanding task that requires verbal working memory as well as problem solving ability. Some of the other tests mentioned also require working memory, but the demand is more visual than verbal, an area in which he clearly has less difficulty. Also, he was relatively slow to perform Trails B, a task that includes both verbal and non-verbal demands. However, he was slow also on Trails A, a part of the Trails test that has less verbal demand, suggesting that motivation may have affected his performance on the Trails tasks.

His WAIS-III based working memory index was 84 (low average), and he reflected a general memory index that was described as "borderline" (70). He recalled three of three objects on the MMSE immediately and 3 of 3 following a delay. On the WMS-III, his auditory immediate memory (77) was seen as "borderline," but auditory delayed (86) was "low average." Visual immediate memory (65) was "extremely low," and visual delayed (62) also was "extremely low." "Recognition delayed" was "borderline," as well (75).

Overall, the plaintive reflected a mixed picture in terms of cognitive abilities. He reflected a normal mental status. At the same time, tasks that involve verbal demands appear to present difficulty for the plaintiff, e.g., abstraction, some problem solving tasks, or some others that involve the use of language. Tasks that demanded working memory were performed adequately for the most part, and at levels that were consistent with his level of general ability. On the other hand, he performed poorly on formal tests of memory, whether verbal or visual. His better, and normal, performance on the delayed portion of the WMS-III verbal memory task is unusual, as is his relatively low performance on recognition learning, a task that is viewed generally as easier than a free recall task. These last two observations suggest that motivation may have played a role in producing test results that underestimate his true ability to learn and remember. On the other hand, his educational history likely also explains some portion of his cognitive difficulties.

Psychomotor performance. Grip strength was relatively strong, but there was a lack of the normally expected dominant hand advantage for this right handed individual (R=51.6, L=53.7). Finger tapping speed was low in both hands, again with lack of dominant hand advantage (R=34.3, L=43.0). Grooved Pegs, also showed the non-dominant hand to be faster than the dominant (R = 89, L = 78, no drops either hand). His speed with the dominant, right hand, depending on norms used, may be borderline in terms of normal; while the left hand is normal. With the possible exception of Digit symbol, he performed normally on Wechsler subtests with psychomotor components, e.g., Block Design (11). Trails A performance was borderline to below (44" with no errors). Writing (printing) was adequate in terms of graphic production and reflected normal motor control. Figure drawing also reflected adequate motor control and fine motor movements. No gross motor abnormalities were noted by observation or testing, in terms of gait, balance, coordination, or strength.

Overall, the plaintiff reflected normal gross and fine psychomotor performance. However, he was mildly slow on Trails, and with the dominant hand on pegs and tapping. Other motor tasks with a time demand appeared to be performed normally in terms of speed, e.g., Block Design. Motivation could have played some role in his slower than expected motor performance. Also, the hint of a relative weakness and slowness with the dominant hand would be consistent with his long-term history of specific verbal impairment, i.e., SLD. Regardless, the findings in this area of the examination are most likely of little or no clinical significance in terms of active pathology.

From an emotional viewpoint, and because of his very low reading and comprehension levels, the plaintiff was administered the SCL-90-R. His productions on this inventory, as well as on another self-rating scale clearly reflected over-endorsement of psychopathology. His ratings were to the extreme that no differentiation could be made between the various conditions of depression, anxiety, thought disorder, and other pathological conditions on the basis of those results.

While I have not yet seen the MMPI-2 reportedly administered by Dr. Sewick in his 2004 examination, the report mentioned a pattern of "virtuous" response, and I suspect those results

were psychometrically invalid. Also, I would like to know how the MMPI was administered since the required reading level for the standard administration is higher than the level determined for the plaintiff. His low score on comprehension also would be a factor to consider in administering the MMPI. Still, I would like to see these test results. Also, Dr. Sewick concluded difficulties with depression, irritability, mood regulation, and fatigue. It is not clear if these were meant by Dr. Sewick to be formal diagnoses, but I would like to know this, as well as all information his conclusions were based on.

Dr. Weintraub (2005) reported the results (a score of 41) from a Beck Inventory (presumably the depression inventory as there are several types of Beck inventories). Dr. Weintraub mentioned the need for the plaintiff to address depression, anxiety, anger, problems with concentration, memory, and other neurocognitive issues. It is not clear if these were formal diagnoses or, if so, upon what they were based.

The plaintiff's educational records mentioned behavioral difficulties at several times (1997, 2000) during his evaluations (e.g., motivation, attitude, effort, and general behavior difficulties; mention of recommendation for medicine for ADHD, and plan for response to class room disruption).

The plaintiff did state that he felt depressed. By observation, however, I found no evidence for thought disorder or other severe psychological disturbance. His affect appeared to be normal, with a normal range of expression. His mood was quiet, but I found no evidence for diagnosable, clinical depression. The list of medications he is taking currently remains unclear, however, some mentioned to me by the plaintiff can cause many of the symptoms he complains of, including emotional symptoms (e.g., topamax, Ambien), and the Pamelor mentioned by Dr. Weintraub can also lead to worsened depression and other complaints mentioned by the plaintiff, including difficulties with sleep. The plaintiff reported to me that he talks to a psychologist about his feelings of depression.

**In closing**, Mr. Haddad reflected some areas of neuropsychological abnormality in his examination results. These include impairments in intellectual function, with a pattern of strengths and weaknesses that involve primarily verbal areas and that appears to be consistent with long-standing learning disability. Relatedly, impairments were noted in some language areas, including reading and spelling, but, also, other areas of weakness that depend on verbal ability and that are most likely another reflection of his history of SLD, e.g., verbal fluency, comprehension, and written communication. His test performance in the cognitive area was mixed, with good orientation to his surrounding and a normal mental status in general; but again, tasks with verbal involvement were performed relatively more poorly than were non-verbal based tasks. He did poorly on formal tests of memory, whether verbal or visual. The pattern of scores here, however, suggests a combination of history of SLD together with less than optimal effort as being explanatory to his memory scores. While some anomalies in psychomotor performance were noted, no significant clinical interpretation was associated with those findings.

The plaintiff complained of feeling down and depressed. And, depression, anxiety, and other behavioral abnormalities have been attributed to the plaintiff by others. However, I found no evidence in my evaluation for a diagnosable, emotional disorder. I would not question that he experiences low feelings, but I did not find these, at least as manifest in my presence, to reach the magnitude of a diagnosable depression. As with anyone voicing concerns about depression, it will be important that he continue to talk to his regular doctors about his feelings and to follow their guidance about how to deal with those feelings. Also, and since he may be taking medications with side effects that include mood and other behavioral alterations, he should work

with his regular doctors in this area as well. He indicated to me that he is talking to someone about these matters.

The plaintiff identifies the incident in November 2004 at the Palace as the cause of his present complaints. I did not find evidence in my evaluation that would substantiate that event as causal to his present neuropsychological complaints. While the medical records from that time do reflect altered consciousness and "closed head injury," I found no reports of neurological damage sufficient to explain the plaintiff's continuing complaints. Imaging and other neurological tests at the time and since were reported as normal or did not indicate dysfunction sufficient to explain his complaints. At the same time, other records have contained information sufficient to explain his complaints. These records include his past educational evaluations, classification as specific learning disabled, records relating to various medications and medication related behaviors.

Based on the information and test results available to me at this time, I conclude that the plaintiff's complaints as addressed in this examination are explainable on the basis of preexisting learning disability and related behavioral difficulties as well as a less than optimal motivational approach to the examination itself. Also, it is possible that medications the plaintiff may be taking could have been directly or secondarily contributory to the test results. This last is based on side effects known to be associated with the medications he may be taking (e.g., Ambien: potential side effects include depression and other psychological disturbances, headache, drowsiness, and other; imitrex: drowsiness and sedation, fatigue, paresthesia, and other; Topamax: somnolence, nervousness, psychomotor slowing, memory disturbance, depression, paresthesia, concentration problems, and other; etc.)

As mentioned earlier, it would be helpful to review and compare the results from the current examination with those obtained in his past examinations, especially Dr. Sewick's 2004 examination, but also any others the plaintiff may have received. Once I have had an opportunity to make such a comparison, I will prepare a supplemental report, if indicated. Also, I will consider at that time if any interpretive adjustments need to be made as a result of multiple testing over time.

Thank you for allowing me to see this person. Please let me know if I can provide further information or assistance.

Sincerely,

Stanley Berent, Ph.D.
Professor Emeritus of Psychology
Licensed Psychologist
Diplomate: American Board of Professional Psychology